UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYRESE T. ROLAND, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 14 C 10161 ) |
| THOMAS DART, Sheriff of Cook County, | ) Judge Rebecca R. Pallmeyer ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In June 2014, Plaintiff Tyrese T. Roland, then a detainee at the Cook County Department of Corrections (CCDOC), injured his right eye during a basketball game. Roland slowly lost vision in the eye. By June 2015, his vision had deteriorated to the point that he could no longer perceive light out of his right eye. Plaintiff has sued the County of Cook and Cook County Sheriff Tom Dart in his official capacity (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging that their policies and practices demonstrated deliberate indifference to Plaintiff's medical needs and exacerbated the severity of his eye injury. Plaintiff also brought suit against one of his treating physicians, Dr. Muhammad Rafiq, but all claims against Dr. Rafiq have since been dismissed. Defendants have each filed motions for summary judgment [74] [77]. For the reasons discussed below, the court denies Defendants' motions.

## BACKGROUND

The parties have filed statements of material facts in accordance with Local Rule 56.1(a)(3). Where the parties have failed to cite to support in the record to dispute directly facts set forth in the statements, the court deems those facts to be admitted. *See* Local Rule 56.1(b) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *see also F.T.C. v. Bay*

1

*Area Bus. Council, Inc.,* 423 F.3d 627, 633 (7th Cir.2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.").

**I.    Plaintiff's Injury and Treatment**

Plaintiff was incarcerated at CCDOC, primarily in Division XI, from April 2014 until his transfer to the Illinois Department of Corrections (IDOC) in December 2014. (Defs.' Jt. Rule 56.1 Stmt. of Mat. Facts [78], hereinafter "Defs.' 56.1," ¶¶ 1–2.) While playing basketball on June 28, 2014, Plaintiff suffered an injury when he was poked in his right eye. (*Id.* ¶ 20.) The following day, Plaintiff had watery, crust-covered eyes and vision difficulties, and he requested medical assistance. (Dep. of Tyrese Roland, Ex. A to Defs.' 56.1 [78-2], hereinafter "Roland Dep.," 34:24–35:14.) A CCDOC officer transported Plaintiff to the Division XI dispensary, where Elizabeth Santos, a registered nurse (RN), evaluated him and sent him to the emergency room at Cermak Health Services, CCDOC's on-site medical facility. (Defs.' 56.1 ¶¶ 21–22.) During Dr. Rafiq's evaluation of Plaintiff at Cermak, Plaintiff told him about the injury he suffered the previous day. (*Id.* ¶ 23.) After examining Plaintiff, Dr. Rafiq diagnosed conjunctivitis, an eye infection that usually resolves on its own, and prescribed the antibiotic ointment erythromycin. (*Id.* ¶¶ 24–25.) Plaintiff asserts that following this visit with Dr. Rafiq, he made at least two oral requests to CCDOC staff members to be taken to the division dispensary to visit a doctor. Each time, he asserts, the officer denied his request and instructed him to fill out a health service request ("HSR") form instead. (Pl.'s Rule 56.1 Stmt. of Add'l Facts [80], hereinafter "Pl.'s 56.1," ¶ 21; Roland Dep. 43:1–16.) Defendant denies that officers ever refused Plaintiff's requests, and assert that detainees' requests to be taken to the dispensary are never refused. (Defs.' Resp. to Pl.'s 56.1 [84] ¶ 21.)

Five weeks after seeing Dr. Rafiq at Cermak, Plaintiff continued to have vision problems. On August 3, 2014, he filled out and submitted an HSR form, which is the primary method by

which CCDOC inmates request non-emergency healthcare. (*Id.* ¶¶ 4, 26.) Inmates at CCDOC place HSR forms in lock boxes that only Cermak personnel can access. (*Id.* ¶ 6.) According to a Cermak written policy (Policy # E-07), which is dated November 2, 2012 and entitled "NONEMERGENCY HEALTH CARE REQUESTS AND SERVICES," HSR forms must be picked up daily and reviewed by a nurse or other qualified health care professional within 24 hours of collection. (*Id.* ¶ 5; Cermak Policy E-07, Ex. K to Defs.' 56.1 [78-12], hereinafter "Policy E-07.") If the HSR form describes a "clinical symptom," a "qualified health professional" must conduct a face-to-face evaluation of the patient on the next business day in the division's dispensary or other clinical setting. (*Id.*) "Qualified health care professionals" include RNs and licensed nurse practitioners (LPNs). (*Id.* ¶ 19.) Any medical symptom, such as a headache, constitutes a "clinical symptom." (Pl.'s Rule 56.1 Stmt. of Additional Facts [80], hereinafter "Pl.'s 56.1," ¶ 4.) In Division XI, Nurse Santos typically collects and reviews the HSR forms and determines whether the detainees who submitted the forms should be transported to the dispensary for evaluation. (Defs.' 56.1 ¶ 15.). If she is not working on a particular day, other Cermak employees can collect the forms, and all Cermak personnel working in Division XI share the responsibility of entering HSR forms into detainees' electronic medical records. (*Id.* ¶¶ 16, 18.)

Lisa Locke, an LPN at Cermak, reviewed Plaintiff's August 3 HSR form on August 10, 2014 and entered the form into his electronic medical record.[1] (*Id.* ¶ 30; Defs.' Answer to Pl.'s First Request to Admit, Ex. 5 to Pl.'s Resp. to Defs.' 56.1 [80-2], ¶ 3.) On the form, Plaintiff stated that he had been given erythromycin to treat his vision but that his vision was getting worse. (Defs.' 56.1 ¶ 26.) Though vision loss is a "clinical symptom," Nurse Locke did not

---

[1] If Plaintiff submitted the form on the same day he completed it (that is, August 3), then the seven-day delay before Locke reviewed it appears to violate Cermak Policy E-07, which calls for review of HSR forms within 24 hours of submission. Defendant notes that the electronic HSR form indicates that the form was placed in the box for review on August 9, suggesting that Locke reviewed the form within the 24-hour period, as required. (Defs.' 56.1 ¶ 30.) Plaintiff, however, disputes the reliability of the date on the electronic form; he notes that was Nurse Locke herself who made that date entry. (Pl.'s Resp. to Defs.' 56.1 [80] ¶ 30.)

conduct a face-to-face evaluation of Plaintiff. (Defs.' 56.1 ¶ 30.) Instead, she requested a "routine" appointment for Plaintiff to see the optometrist at Cermak onOctober 10, 2014. (*Id.* ¶ 31.) It is unclear from the record whether such an appointment was ever scheduled, nor is it clear why Nurse Locke requested an appointment date two months away. Defendant asserts that October 10 was the optometry department's next available date. (Defs.' 56.1 ¶ 30.) Nurse Locke testified at her deposition that she "just came up with that date . . . a couple of weeks out" because she could see the optometry's department schedule and could see that they were "booked up." (Dep. of Lisa M. Locke, Ex. D to Defs.' 56.1 [78-5], hereinafter "Locke Dep." 72:24–73:6.).[2] Plaintiff avers that he submitted another HSR form at the end of August 2014 in which he repeated his complaint of vision loss. (Pl.'s 56.1 ¶ 25; Roland Dep. 30:14–20.) Defendants have no record of any such form and deny that it was submitted.

It is undisputed, however, that Plaintiff completed and submitted another HSR form on October 1. On the October 1 form, he stated, "My vision is going out due to trauma," and reported that he had had the problem for five months. (Defs.' 56.1 ¶ 37.) Nurse Locke reviewed that form on October 3 (*Id.* ¶ 38), and requested an appointment with the optometrist for December 10, 2014. (Pl.'s Medical Records, Ex. M to Defs.' 56.1 [78-14], at CCU 27.) Plaintiff submitted two additional HSR forms, dated October 4, 2014, in which he complained of symptoms unrelated to his eye. (Defs.' 56.1 ¶ 40.) Nurse Santos picked up these forms on October 5, and conducted a face-to-face evaluation of Plaintiff that day. (*Id.*) She made a note that Plaintiff reported having blurry vision in his right eye since May 2014 and that he had occasional headaches but no nausea, vomiting, or dizziness. (Pl.'s 56.1 ¶ 33.) On October 14, the optometrist at Cermak examined Plaintiff and made a referral to Cermak's on-site

---

[2] Nurse Locke herself did not have the authority to schedule appointments. (Locke Dep. at 74:18–24.)

ophthalmologist; the medical record called the referral "urgent."[3] (Defs.' 56.1 ¶ 42; Pl.'s Medical Records CCU 50.) The next day, Plaintiff visited an ophthalmologist, who observed that his retina was detached and initiated a request for Plaintiff to see a retinal specialist. (Def.'s 56.1 ¶ 43–44.) The following day, October 16, Plaintiff visited the Stroger Hospital eye clinic and was diagnosed with "chronic retinal detachment with the macula off." (*Id.* ¶ 45.) Plaintiff visited the Stroger eye clinic again on October 20 and 22. (*Id.* ¶ 47.) At his October 20 evaluation, he was still able to count fingers and see motion. (Pl.'s 56.1 ¶ 35.)

Dr. Demitra Skondra, Plaintiff's retinal specialist, determined that he did not require urgent surgery. (Defs.' 56.1 ¶ 48.) At that time in October 2014, Plaintiff was on trial for his criminal charges and faced the possibility that he would be sentenced to serve time at an IDOC correctional facility. (*Id.* ¶ 46.) Because of the complicated nature of the surgery and recovery Plaintiff required, Dr. Skondra believed it was more important that Plaintiff have surgery at a time when he could stay in one place afterward (either by having his sentencing continued or by having surgery after transfer to the IDOC) than to perform the surgery as soon as possible. (*Id.* ¶¶ 48–52.) Dr. Skondra eventually scheduled the surgery for December 16, believing that the judge would keep Plaintiff in Chicago.[4] (*Id.* ¶ 54.) Dr. Skondra eventually had to reschedule the surgery for December 30 to address a more urgent case. (*Id.* ¶¶ 54–55.) Despite Plaintiff's attempts to stay the sentencing to allow him to recover from surgery at CCDOC, Plaintiff was sentenced on December 18 and transferred to the IDOC the following day. (Pl.'s 56.1 ¶ 40.)

---

[3] It is unclear why Plaintiff's appointment with the optometrist was on October 14, rather than on October 10 as Nurse Locke had requested. Plaintiff argues in his brief that Nurse Santos facilitated Plaintiff's being seen by the optometrist, but he provides no evidentiary support for that assertion. (*See* Pl.'s Mem. in Opp. to Defs.' Summ. J. Mot. [81]. hereinafter "Pl.'s Mem.," 4.) Nurse Santos explained that an appointment may be scheduled "around the time" of the requested date if that date is unavailable (Dep. of Elizabeth Santos, Ex. B to Defs.' 56.1 [78-3], hereinafter "Santos Dep.," 143:20–144:6), and that may be what occurred in this instance.

[4] It is unclear why Dr. Skondra believed Plaintiff would remain in Chicago, but a note written by a medical resident on the day that Dr. Skondra scheduled the surgery indicates that the judge would keep Plaintiff in Chicago. (Dep. of Dimitra Skondra. M.D., Ex. H to Defs.' 56.1, 133:12–22.)

Plaintiff's medical records were emailed to IDOC on December 22. (Defs.' 56.1 ¶ 58.) Though Plaintiff informed IDOC staff about his eye condition, as of the date of briefing in this case he had still not had surgery, and he no longer has vision (including perception of light) in his right eye. (Pl.'s 56.1 ¶ 37.)

II.     **Defendants' Alleged Policies and Practices**

The Sheriff of Cook County (the "Sheriff") is responsible for operating CCDOC. (Inter-Agency Agreement Between the Office of the Sheriff of Cook County and the Cook County Health and Hospitals System, Ex. 6 to Pl.'s 56.1 [80-2], hereinafter "Inter-Agency Agreement," at 1.) Cook County itself (the "County"), specifically the Cook County Health and Hospitals System (CCHS), is responsible for operating Cermak, an entity separate from CCDOC. (*Id.*) *See also Boyce v. Moore*, 314 F.3d 884, 887 n.1 (7th Cir. 2002). Though they are separate entities, the Sheriff and CCHS have signed an inter-agency agreement, under which CCDOC must "[p]articipate with Cermak in a coordinated approach to the delivery of health care to detainees [and] [d]evelop mutually acceptable policies and procedures to accommodate both security requirements and clinical needs for professional practice . . . ." (Pl.'s 56.1 ¶ 2; Inter-Agency Agreement at 4–5.) A representative from the Sheriff's office attends meetings with representatives from Cermak, Judge Kendall of this court, and a medical monitor appointed in connection with litigation concerning medical conditions at CCDOC, *United States v. Cook Cnty.*, No. 10 C 2946. (Pl.'s 56.1 ¶ 8.)

Plaintiff asserts that the County and the Sheriff were aware that Cermak had a shortage of nurses, which resulted in delayed access to care for CCDOC inmates, including delayed responses to inmates' HSR forms and delayed face-to-face evaluations of inmates. At meetings and in reports issued in connection with the litigation mentioned above, the medical monitors appointed in that case expressed concerns regarding nursing staff shortages and delays in access to care for CCDOS inmates. (*See id.* ¶¶ 9–13.) In addition, the former head nurse at Cermak, Cynthia Kienlen, made recommendations to the monitors that staffing be increased to

6

improve collection and processing of HSR forms. (*Id.* ¶ 14.) The Sheriff's Office acknowledged the findings made by the medical monitors (*see id.* ¶ 16), but Defendants dispute the contents and reliability of both Nurse Kienlen's testimony and the monitors' reports. (*See* Defs.' Resp. to Pl.'s 56.1 ¶¶ 6, 9–16.) Defendants argue that Nurse Kienlen's testimony may be unreliably biased because Cermak fired her in April 2014 and that the monitors' reports are inadmissible hearsay generated in the adversarial context of another litigation. (*See id.*)

III.    **Alleged Connection Between Defendants' Policies and Plaintiff's Injury**

According to Plaintiff, Cermak's ongoing nursing staff shortage and resulting problems with providing timely medical care caused his treatment to be delayed, which exacerbated his injury. Plaintiff maintains that instead of addressing the problem of a nursing shortage, the Sheriff made the problem worse by opening a new prison building and requiring existing nurses to work overtime to staff that building. (*See* Pl.'s 56.1 ¶ 6; Dep. of Cynthia Kienlen, Ex. I to Def.'s 56.1 [78-10], hereinafter "Kienlen Dep.," 50:5–12.) Though Division XI had no nursing vacancies during the time that Plaintiff was incarcerated there (Defs.' 56.1 ¶ 11), nurses from Division XI were "pulled" or reassigned to other division when there were staff shortages elsewhere. (Pl.'s 56.1 ¶ 19). Plaintiff asserts that on August 2, 3, 9, 10, 23, and 28, no RN was assigned to Division 11, making Nurse Locke the ranking member of the nursing staff on duty; Defendants insist there was always a nursing supervisor on duty. (*See* Defs.' Resp. to Pl.'s 56.1 ¶ 23.) Plaintiff also asserts that nurses failed to visit Plaintiff's tier in Division XI to collect HSR forms on a number of occasions. In support, he offers a health service request log, which shows that there were ten separate days in August on which no nurse initialed the form to show that HSR forms were collected, including five days at the end of August—the period when Plaintiff allegedly submitted the HSR form of which Defendants have no record. (*See* Pl.'s 56.1 ¶ 39; HSR Form Log for Div. 11, Tier AA, August 2014, Ex. L to Defs.' 56.1 [78-13].) Defendants respond that HSR forms were collected every day, even if the nurses failed to initial the log each day. (Defs.' Resp. to Pl.'s 56.1 ¶ 39.)

Plaintiff contends that if Cermak had been adequately staffed and an RN had promptly reviewed his August 3 HSR form, then the RN would have conducted a face-to-face evaluation, and Plaintiff's retinal attachment could have been diagnosed and addressed earlier. One of the RNs who worked in Division XI, Sheryl Burns, stated that, had she reviewed Plaintiff's August 3 HSR form, she would have conducted a face-to-face meeting with him. (Pl.'s 56.1 ¶ 24; Dep. of Sheryl Burns, Ex. C to Defs.' 56.1 [78-4], hereinafter "Burns Dep.," 119:21–120:2.) Plaintiff's nursing expert, Dr. Jacqueline Moore, similarly testified that "[i]f there had been an RN there and they were as good as Nurse Santos and Nurse Burns, they would have done a face-to-face interview with that patient and done a more thorough assessment." (Dep. of Jacqueline Moore, Ex. J to Defs.' 56.1 [78-11], hereinafter "Moore Dep.," 131:13–19.) If Plaintiff had been evaluated in August, his expert ophthalmologist believes that such an evaluation "would have allowed an earlier diagnosis and an improved outcome." (Pl.'s 56.1 ¶ 34; Expert Report of Jack A. Cohen, M.D., Ex. 10 to Pl.'s 56.1 [80-2], hereinafter "Cohen Report," at 4.) Dr. Cohen elaborated on this possibility in his deposition:

> [I]f he was seen August 2nd, I'm sure his macula was probably detached.
>
> Would he have had surgery August 5th? Maybe not. It probably doesn't make much of a difference. But maybe by August 10th, he would have had surgery and maybe you could have done a scleral buckle and you could have done a vitrectomy and reattached his retina, and the guy would have his eye, and it wouldn't be shrunken like a shriveled grape, and he would have some sight.

(Pl.'s 56.1 ¶ 34; Dep. of Jack Cohen, M.D., Ex. 11 to Pl.'s 56.1 [80-2], hereinafter "Cohen Dep.," 101:20–102:4.)

In this lawsuit, Plaintiff alleges that Defendants knew about the shortage of nurses at Cermak and the resulting delays in inmates' access to care and that Defendants' failure to address these issues constituted deliberate indifference to his serious medical condition, in violation of the Eighth and Fourteenth Amendments. Defendants have both moved for summary judgment.

**DISCUSSION**

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A court reviewing a summary judgment motion must "construe all facts and reasonable inferences in favor of the nonmoving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The court's favor, however, "does not extend to drawing inferences that are supported only by speculation or conjecture." *Id.* Plaintiff thus bears the burden of demonstrating, through the presentation of "specific facts," that there is a genuine issue for trial. *Id.*

A prisoner who brings a § 1983 action alleging inadequate medical care in violation of the Eighth or Fourteenth Amendments must demonstrate that he suffered a "deprivation that is, form an objective standpoint, sufficiently serious that it results in the denial of the minimal measure of life's necessities and [that] prison officials [were] deliberately indifferent to his state of affairs." *Gray v. Hardy*, ___ F.3d ___, No. 13-3413, 2016 WL 3457647, at *2 (7th Cir. June 24, 2016) (quotation marks omitted). Where, as in this case, a plaintiff seeks to hold a municipality (as opposed to an individual) liable for the unconstitutional act that resulted in the alleged injury, the plaintiff must show that the injury was caused by "an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). In a situation where the development of rules or regulations is necessary to remedy a potentially dangerous practice, the "failure to make a policy is also actionable." *Id.* The Supreme Court has cautioned that where a plaintiff's *Monell* claim is based on an assertion that a municipality's policy caused an employee to inflict the constitutional injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs of*

*Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). Those standards require the plaintiff to show that the municipality's deliberate conduct was the "moving force" behind the alleged injury, by demonstrating "a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404.

Defendants concede that Plaintiff's eye injury constitutes an objectively serious medical condition, but they deny that Plaintiff has produced admissible evidence to demonstrate that any official policy or practice showed deliberate indifference to his medical needs or that any such policy or practice was the moving force behind his injury. In addition, the Sheriff argues that his office cannot be liable for Plaintiff's injury because the provision of medical care to inmates at CCDOC is the responsibility of Cook County, not the Sheriff's Department. The court discusses the Sheriff's argument first before turning to the arguments both Defendants raise.

I. **The Sheriff's Responsibility**

Courts within this district have reached different conclusions about whether a CCDOC inmate can hold the Sheriff liable under § 1983 for alleged denials or delays of medical treatment. *Compare Harrison v. Cty. of Cook*, No. 08 C 3202, 2011 WL 4036115, at *8 (N.D. Ill. Sept. 12, 2011) (prisoner's claim against Sheriff failed as a matter of law; County was responsible for providing medical care to detainees, and there was insufficient evidence that Sheriff's office provided medical care or otherwise contributed to County's alleged deliberate indifference) *with Johnson v. Dart*, No. 15 C 1327, 2016 WL 1392324 (N.D. Ill. Apr. 8, 2016) ("the Court holds that [Sheriff[ Dart is responsible for medical care within the CCJ"); *Johnson v. Sheriff of Cook Cty.*, No. 15 C 741, 2015 WL 1942724, at *1 (N.D. Ill. Apr. 24, 2015) (Sheriff's office is not immune as a matter of law from liability for problems associated with the provision of medical care to CCDOC inmates) *and Bramlett v. Dart*, No. 14 C 5939, 2015 WL 4148711, at *2 (N.D. Ill. July 9, 2015) (plaintiff stated a claim against Sheriff by alleging that Sheriff had failed in his responsibility to ensure that the medical needs of inmates are adequately met) (citation and internal quotation marks omitted. In this case, Plaintiff has presented evidence that the

Sheriff's office entered into an agreement with the County that obligated the Sheriff to participate with Cermak in a "coordinated approach to the delivery of health care to detainees . . . ." (Pl.'s 56.1 ¶ 2; Inter-Agency Agreement at 4.) Plaintiff has also shown that representatives from the Sheriff's office were made aware of problems regarding access to medical care among CCDOC inmates. (*See, e.g.*, Pl.'s 56.1 ¶¶ 10–11.) Thus the court concludes that a reasonable jury could find, on this record, that the Sheriff could have taken some action to address constitutionally inadequate medical care for CCDOC inmates at Cermak.

## II. Evidence of a Policy of Practice

Defendants argue that Plaintiff has failed to present admissible evidence to show that they maintained a policy or practice that evinced deliberate indifference to Plaintiff's medical needs. The evidence upon which Plaintiff relies for this claim, they contend, is inadequate because it (1) shows only isolated instances of improper conduct rather than a widespread practice, (2) is inadmissible as hearsay, or (3) is contradicted by the evidence Defendants have supplied.

Defendants urge that Plaintiff's evidence does not establish the existence of a widespread practice or policy. Indeed, there is little evidence of any widespread practice on the part of CCDOC officers to deny inmates' requests to visit a doctor in the dispensary. Plaintiff's only evidence of such a "practice" is his deposition testimony that his own requests to visit the dispensary were denied "[l]ike two times." (Roland Dep. at 43:9–10.) To establish a "widespread custom or practice," however, a plaintiff must point to "more than one instance [of misconduct], or even three . . . ." *Thomas*, 604 F.3d at 303 (internal citation omitted).

There is, however, at least some evidence of a constitutionally problematic practice or policy: the evidence that Cermak had a nursing shortage, of which Defendants were aware, that resulted in delayed processing of HSR forms and delayed access to care for CCDOC inmates. That evidence could support a jury determination that Defendants maintained a widespread practice—or at least failed to enact a policy in response to a constitutionally problematic

11

situation—and displayed deliberate indifference to prisoners' medical needs. Defendants challenge the evidence of this purported policy as inadmissible hearsay. Plaintiff's claim of nursing shortages and delays in access to care at Cermak relies heavily on findings from a medical monitor's report that was generated in connection with a separate litigation. The County maintains that the report on which Plaintiff relies contains inadmissible hearsay—but the County appears to be referring to a report issued by the Department of Justice prepared in anticipation of litigation, while the report upon which Plaintiff relies is a post-judgment report of the medical monitor appointed in that case. (*Compare* Def. Cook County's Mem. in Supp. of Mot. for Summ. J. [79] 12–15 (discussing DOJ report prepared to provide pre-suit notice and citing other district court decisions discussing the same pre-suit report) *with* Monitor Esmaeil Porsa's Report No. 8, May 2014, *United States v. Cook County*, No. 10 C 2946, Ex. 8 to Pl.'s 56.1 [80-2] (discussing post-judgment compliance with agreed order issued in that case).)

Plaintiff, for his part, interprets the County's argument as attacking the admissibility of the monitor's report, but he neglects to address the issue of whether the report is admissible, focusing instead on other evidence of the alleged unconstitutional practice or policy. (*See* Pl.'s Mem. at 10.) As the court reads the monitor's report, regardless of whether it is admissible to support the assertion that there was a nursing shortage and a practice of delayed medical care for CCDOC inmates, the report is, at a minimum, admissible as evidence that Defendants had notice of these concerns. In addition, Plaintiff has provided testimony from Cermak nurses, based on their own personal knowledge, about the nursing shortages and delayed processing of HSR forms, including testimony that nurses in Division XI were reassigned to other divisions because of staffing shortages elsewhere. (*See* Pl.'s 56.1 ¶¶ 9, 12–14, 19–20, 23.)

In short, the record contains sufficient evidence to allow a jury to find that there was a practice of understaffing nurses at Cermak, of which Defendants had knowledge and which may have led to delayed access to medical care for CCDOC inmates. Defendants dispute that there actually was a shortage of nurses in Division XI during the relevant time period, but Plaintiff has

produced evidence that Division XI nurses were reassigned to other divisions and that Division XI occasionally lacked an RN on duty. That evidence is sufficient to create a question of fact for the jury about Defendants' practices related to the adequacy of the nurse staffing in Plaintiff's division. (*See* Pl.'s 56.1 ¶¶ 19–20, 23.)

In addition to the shortage of nurses within Cermak, the court understands Plaintiff to be asserting that Defendants maintained two other constitutionally problematic policies or practices, which allegedly resulted in his injuries: (1) Cermak Policy E-07, which allowed LPNs to review HSR forms; and (2) a practice of ignoring or misplacing HSR forms, such as the form Plaintiff allegedly submitted at the end of August 2014. With respect to Policy E-07, there is little evidence in the record to suggest that the policy itself is constitutionally problematic. Plaintiff asserts that the policy violates state law because it allows LPNs like Nurse Locke to review HSR forms and make health assessments, which is outside the scope of an LPN's practice under the Illinois Nurse Practice Act, 225 ILCS 65/55-30. That law, however, permits LPNs to "collect[] data and collaborat[e] in the assessment of the health status of a patient." 225 ILCS 65/55-30(a)(1). Plaintiff may be correct that the statute does not permit an LPN to make an independent assessment or diagnosis of an inmate's health, but Policy E-07 does not appear to contemplate such a practice. Instead, the policy permits LPNs to review HSR forms to determine whether a face-to-face evaluation was necessary, setting forth, as the only stated criterion for making that determination, whether or not the HSR form stated a clinical symptom. (*See* Pl.'s 56.1 ¶ 4.) Plaintiff has presented no evidence that the authority to determine whether an HSR form stated a clinical symptom—whether the form stated that the patient had a headache, for example, as opposed to "I need new shoes," (Kienlen Dep. 99:8–12)—is outside the scope of an LPN's practice. The fact that Nurse Locke apparently failed to follow Policy E-07 by neglecting to conduct a face-to-face evaluation despite the clinical symptom stated in Plaintiff's August 3 HSR form does not show that the policy itself was problematic. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989) (rejecting argument that employee's

unconstitutional application of policy could subject city to liability because under that theory "liability would then rest on *respondeat superior*"). And the fact that an official violates state law does not by itself establish a federal Constitutional violation. *Armstrong v. Daily*, 786 F.3d 529, 542 (7th Cir. 2015).

Plaintiff also notes jail officers' failure to respond to the HSR form he claims to have submitted in late August, and argues that this failure, too, contributed to his injury. Defendants have no record of that late August HSR form. In any event, apart from this single instance in which the nurses allegedly failed to respond at all to—and possibly misplaced—his HSR form, there is no evidence that Defendants had knowledge of a widespread practice that nurses were failing to respond completely to HSR forms. Thus a theory of *Monell* liability based on the failure to respond to Plaintiff's late August HSR form is infirm.

Defendants' practices with respect to HSR forms are insufficient to establish a policy, but as explained above, the nursing shortage, arguably did constitute a widespread practice. If that practice resulted in the Division XI nursing staff's misplacing or ignoring Plaintiff's complaint, the court must address whether the evidence is sufficient to establish that this practice caused his injury.

### III.    Causation

To succeed on a *Monell* claim, the plaintiff must "show a direct causal connection between the policy or practice and his injury." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). On this issue, Plaintiff faces an uphill battle: The chain of causation connecting Defendants' alleged practice to the aggravation of Plaintiff's injury is long, and a jury may well be unable to draw the inferences necessary to bridge the gap between the practice and the injury without resorting to speculation or conjecture.

Plaintiff's counterfactual account of how Defendants could have prevented or mitigated his injury appears to include the following steps and inferences: (1) Defendants could have hired additional nurses at Cermak; (2) as a result, an RN would have been available to review

14

Plaintiff's August 3 HSR form, and his late August form would not have been lost or ignored; (3) unlike Nurse Locke, the RN would have immediately conducted a face-to-face-evaluation of Plaintiff; (4) based on the evaluation, the RN would have scheduled an emergency appointment for Plaintiff with an optometrist or ophthalmologist sooner than the appointment Nurse Locke scheduled; (5) the optometrist or ophthalmologist would have diagnosed Plaintiff's retinal detachment or would have referred him to a specialist who would do so quickly; (6) Plaintiff would have had surgery on his eye "maybe by August 10th . . . and maybe [the surgeon] could have done a scleral buckle and . . . could have done a vitrectomy and reattached his retina, and the guy would have his eye. . . ." (Cohen Dep. 101:20–102:4).

This causation chain is a long one, and it may be difficult for a jury to conclude that Defendants were a *but-for* cause of Plaintiff's injury, let alone the "moving force" behind it. *Brown*, 520 U.S. at 405. For example, there is little evidence that it was Division XI's failure to staff nurses qualified to review HSR forms (because they have not shown that Nurse Locke was unqualified) that resulted in Nurse Locke's failure to conduct a face-to-face evaluation of Plaintiff. Nor is it clear that if an RN had reviewed Plaintiff's forms, he or she would have scheduled Plaintiff for an earlier appointment with an eye doctor. RN Burns herself testified that Plaintiff's complaint of vision loss in his August HSR would have prompted her to conduct a face-to-face evaluation, but that there would not be any urgency in doing so. (Burns Dep. 120:9–12.) Finally, even if the above inferences were supported and Plaintiff had been seen by a surgeon in early August, the testimony of Plaintiff's medical expert, Dr. Cohen, about whether an early August surgery would have improved his condition is itself arguably speculative, as is his statement that "[a]n August evaluation would have allowed an earlier diagnosis and improved outcome." (Cohen Report at 4.) All of that said, the court concludes that a jury, not the court, should make the determination whether Defendants' policies or practices—whether understaffing or generally allowing delayed processing of HSR forms—were the cause and "moving force" behind Plaintiff's injury. *See Dixon v. Cty. of Cook*, 819 F.3d 343, 349 (7th Cir.

2016) (reversing grant of summary judgment where reasonable jury could find that systemic deficiencies in detention center's healthcare system were moving force behind plaintiff's injury).

## **CONCLUSION**

Plaintiff has presented enough evidence to allow a reasonable jury to conclude that Defendants' policies or practices were the moving force behind Plaintiff's eye injury. Defendants' motions for summary judgment [74] [77] are therefore denied.

ENTER:

*[signature]*

Dated:  August 11, 2016

REBECCA R. PALLMEYER
United States District Judge